**THIRD DIVISION**
**MCFADDEN, C. J.,**
**DOYLE, P. J., and HODGES, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. Please refer to the Supreme Court of Georgia Judicial Emergency Order of March 14, 2020 for further information at (https://www.gaappeals.us/rules).**

**June 4, 2020**

# In the Court of Appeals of Georgia

A20A0435. ALIERA HEALTHCARE, INC. v. ANABAPTIST HEALTHSHARE et al.

MCFADDEN, Chief Judge.

This dispute arises from the acrimonious termination of a business relationship. Aliera Healthcare, Inc. appeals an order appointing a receiver and granting an interlocutory injunction to Anabaptist Healthshare and its wholly owned subsidiary, Unity Healthshare, LLC.

The trial court's extensive findings of fact are not clearly erroneous. Under those findings, Aliera cannot show that the trial court manifestly abused her discretion in either ruling. So we affirm.

1. *Trial court's findings of fact*.

The trial court's order was entered after a two-day hearing. We owe deference

to her findings of fact. Where, as here, the trial judge hears evidence and sits as the trier of facts,

> [her] findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them. . . . [T]he trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous [and] the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment. . . . [T]his standard of review requires us to focus on the findings of fact made by the trial court in [her] order and the evidence supporting those findings, rather than other evidence gleaned from the record, construing it in favor of upholding the trial court's order.

*State v. Rosenbaum*, 305 Ga. 442, 449 (2) (826 SE2d 18) (2019) (citations and punctuation omitted). See also *Mondy v. Magnolia Advanced Materials*, 303 Ga. 764, 773 (4) (b) (815 SE2d 70) (2018) (Trial court's order that "expressly specified which portions of the factual record the judge credited and relied upon as well as the judge's legal analysis . . . affect[ed] how the . . . ruling would be reviewed on appeal.")

So viewed, the record shows that the parties entered into an agreement under which their complementary products were marketed together. Aliera was tasked with administering that undertaking and so gained exclusive control over Unity's membership roster and website. Anabaptist and Unity came to believe that Aliera was

2

misappropriating funds and so terminated the agreement. Aliera retained control over the lists and website and used that control to issue opt-out offers to the members/customers.

Appellant Aliera and appellees Anabaptist and Unity all provide alternatives to health insurance. Aliera is a for-profit company. Anabaptist is a non-profit, tax-exempt organization; it manages a health care sharing ministry for members of Anabaptist communities in Virginia. Health care sharing ministries are non-profit organizations that facilitate the sharing of certain medical expenses among their members.

At the relevant time, members of a qualifying health care sharing ministry were exempt from the Affordable Care Act's individual mandate, which required persons to purchase health insurance or pay a tax penalty. See 26 USC § 5000A (a), (d) (1) & (d) (2) (B). (Congress eliminated the individual mandate tax penalty beginning January 1, 2019. See Pub. L. No. 115-97, § 11081 (2017).) So the members of Anabaptist were exempt from the individual mandate. The purchasers of Aliera's products were not exempt from the individual mandate.

Aliera determined that the parties' plans were complementary — and that it could increase its sales if it could sell its plans side by side with an Affordable Care

3

Act-exempt health care sharing ministry plan. To this end, in 2016, Aliera approached Anabaptist to propose a relationship between Aliera and Anabaptist. Eventually they entered the contract at issue.

Under that contract, Anabaptist created Unity, a wholly owned subsidiary, to offer health care sharing ministry plans.

The contract provided that Anabaptist granted Aliera the exclusive license to sell and distribute Unity products. It provided that Anabaptist "was the sole and exclusive owner or authorized licensor of and [would] retain all right, title, and interest, including all intellectual property rights, in and to the 'membership roster,'" an undefined term in the agreement. The contract provided that Aliera remained "the sole and exclusive authorized non-insurance health care company allowed to market and sell health care products to Aliera and Unity HealthShare members [and] retain[ed] all right, title, and interest, including all intellectual property rights, in and to the Aliera products."

Anabaptist board chair Tyler Hochstetler testified that under the parties' contract, member funds collected for Unity products were to be segregated into a separate bank account that belonged to Unity. Hochstetler also testified that Anabaptist and Unity trusted that Aliera would properly account for Unity plan assets

4

and that Aliera would keep the Unity plan assets separate from Aliera's funds. Unity entrusted Aliera with its member information and plan assets.

Aliera offered its products to the public in conjunction with the Unity plans. Aliera served as the program administrator for the Unity plans. The marketing materials for the side-by-side plan offerings emphasized the Unity exemption from the tax penalty of the Affordable Care Act's individual mandate.

Some individuals purchased plans that contained only an Aliera product and some individuals purchased plans that contained only a Unity product. But the vast majority purchased both. Though those plans were offered side by side, only the Unity plan was Affordable Care Act-exempt; so Aliera made clear in its representations to the public and regulators that the plans were legally separate and distinct. Aliera described itself to insurance regulators as a third-party administrator of the Unity plans. It also represented to insurance regulators that it was segregating the Unity plan assets from other funds.

The separate and distinct nature of the Unity plans was also reflected in the Member Guide, which Aliera drafted. The Member Guide delineated between the Aliera component and the Unity component of the combined plans. The Member Guide made clear that the health care sharing ministry was a Unity plan and that the

5

members of that plan were Unity Healthshare members.

Anabaptist representative Hochstetler testified that in January 2018, he learned for the first time that Aliera was not properly segregating Unity plan assets. According to Hochstetler, Aliera's principal, Timothy Moses, who became a member of Anabaptist's board, stated at a January 2018 board meeting that since April 2017, Aliera had not segregated the Unity plan assets, but instead unilaterally allocated revenues in the manner in which Aliera saw fit, keeping as much of the incoming member funds for Aliera's own benefit as it desired. Hochstetler testified that Aliera did not have Anabaptist or Unity's permission or authorization to treat member funds in this way, and that Anabaptist and Unity never authorized Aliera to place Unity funds into Aliera accounts or to use Unity funds for Aliera's own purposes.

Moses' admissions to Anabaptist and Unity demonstrated that Aliera's representations to insurance regulators about the way it treated Unity plan funds were incorrect. Indeed, Aliera's comptroller acknowledged at the interlocutory injunction hearing that member contributions associated with the Unity plans were not sent directly to Unity Healthshare. Rather, he testified that Aliera deposited payments into an account it controlled; that Aliera transferred money from that account to pay claims; and that Aliera performed monthly reconciliations whereby payments were

6

segregated into Aliera and Unity accounts.

Anabaptist presented evidence that it became increasingly concerned about Aliera's administration of the Unity plans during the summer of 2018. It was particularly troubled by Aliera's repeated refusals to disclose information about the Unity plans over which Aliera had assumed complete control.

On May 4, 2018, Unity learned that Moses had written approximately $150,000 in checks to himself out of the Unity operating account without Anabaptist's or Unity's knowledge or authorization.

Hochstetler testified that after learning that the Unity plan assets were not being properly segregated, Anabaptist and Unity took immediate steps to secure the integrity of Unity's funds. Anabaptist first demanded an accounting of Unity funds so that Anabaptist could assess whether Aliera was handling Unity plan assets appropriately. Aliera did not provide Unity with an accounting. On July 25, 2018, Anabaptist instructed Aliera to turn over control of Unity funds to Unity immediately and to direct Unity plan members to make future payments to Unity. Aliera did not comply with either of these demands and continued to collect funds associated with the Unity component of member plans.

Hochstetler testified that Moses had a criminal history, and given that history,

7

Moses' taking funds from the Unity operating account, and Aliera's refusal to disclose complete financial information, he and other Anabaptist board members became seriously concerned that the Unity plan assets were at risk of misappropriation. He testified that Anabaptist removed Moses and his wife, another Aliera executive, from certain Unity bank accounts as signers and ultimately froze two accounts containing approximately $5 million in funds used to pay claims.

On August 10, 2018, following a failed mediation with Aliera, Anabaptist terminated the contract.

The parties' contract provided that, upon termination, "all licenses granted hereunder shall immediately terminate, and the [p]arties will promptly destroy or return all materials in [their] possession which belong to the other [p]arty, including any and all confidential information which may have come into [their] possession."

Anabaptists's termination included an express revocation of Aliera's right to hold the Unity plan funds and demanded that Aliera return control over those funds as well as the Unity membership roster to Anabaptist. Aliera did not turn over the Unity plan funds or the Unity membership roster. Aliera retained possession of the Unity membership roster, all of the Unity plans, all of the Unity plan assets, Unity's intellectual property, including the Unity website, and Unity's employees.

8

After termination of the agreement, Aliera retained the entirety of the Unity member base for itself and continued to maintain control over Unity's website and refused Unity's claims to it.

The testimony at the hearing demonstrated, to the trial court's satisfaction, that Aliera continued to control the Unity website, www.unityhealthshare.org and www.unityhealthshare.com. Aliera has configured those websites so that when a member visits them, the member is automatically redirected to the website of Trinity Healthshare, an entity created by Aliera and its principals on January 1, 2019.

Hochstetler testified that Aliera's retention of the financial information concerning the Unity plans has prevented Anabaptist and Unity from completing 2017 and 2018 audits, which are necessary to retain Unity's status as a health care sharing ministry, and has jeopardized Unity's status as a tax exempt and Affordable Care Act-approved health care sharing ministry. Hochstetler testified that if Unity's status as an Affordable Care Act-approved health care sharing ministry is lost, it may become very difficult to recover, as health care sharing ministries must share health care expenses of its members continuously and without interruption.

On November 15, 2018, Aliera sent a notice to all Unity HealthShare members informing them that, unless they opted out, their membership would be transferred

to a new health care sharing ministry:

> Dear AlieraCare 5000 - Premium Plan Member,
>
> As the year 2018 comes to an end, Aliera Healthcare, Inc. would like to communicate some exciting and important plan information for the upcoming 2019 plan year.
>
> ***No Action is Needed***
>
> Beginning January 1st, 2019 Aliera is excited to announce Trinity HealthShare as its new Healthcare Sharing Ministry (HCSM) partner. Trinity HealthShare is deeply rooted in the traditions of faith with a ministry that is open to providing healthcare sharing to all churches, their employees, missionaries, and individuals who share the same ethical and moral beliefs.
>
> All plan features, including eligible medical services, Member Shared Responsibility Amount ("MSRA"), and monthly member contribution amounts (how much you are billed each month) will remain the same. You also retain access to the same network providers and facilities with the same discounts. Nothing changes on your plan except for the HCSM name.
>
> Your MSRA will continue to accrue through your membership anniversary date. You will not lose any credit for the out-of-pocket expenses.

You don't have to do anything to maintain your current plan. You will retain your Member ID number and continue to contact Aliera Member Services for any assistance you may need regarding your membership. You will receive an updated plan membership card. All contact and processing information remains the same.

If for any reason, you wish not to continue with your AlieraCare 5000 - Premium [] Plan, you may opt-out by *clicking here* to complete a member cancellation form. An Aliera representative will follow up with you promptly to process your request.

Please contact Aliera's Member Services at *(###) ###-####.* Representatives are available, Monday through Friday, 8:00 a.m. – 8:00 p.m. ET to answer any questions.

We wish you health and prosperity in the New Year!

Sincerely,

Your Aliera Family

"No Action Is Needed" was in bold, italicized font, near the top of the notice. The notice made no mention of Unity or of the fact that Unity had terminated its agreement with Aliera. The notice announced that it would transition all Unity

11

members to Trinity, the entity created by Aliera and its principals on January 1, 2019, which is not affiliated with Unity. Unity members had to take affirmative action to opt out of the transition of their plans from Unity to Trinity.

2. *Terms of the injunction.*

Anabaptist and Unity moved for an interlocutory injunction, and the trial court granted the motion. She enjoined Aliera from moving, converting, or in any way unilaterally transitioning to Trinity those individuals who had Unity plans on or before August 10, 2018 (the date Anabaptist terminated the contract), and the assets related to those individuals. The court ordered Aliera to provide Anabaptist and Unity with the names and contact information of those individuals who had Unity plans on or before August 10, 2018. The court ruled that once Aliera had provided Anabaptist and Unity with the contact information, Aliera could solicit those individuals to join Trinity "under the traditional confines of fair competition." .

3. *The trial court did not abuse her discretion in granting an interlocutory injunction.*

Whether to grant a request for interlocutory injunctive relief is within the trial court's discretion, and we will not reverse the trial court's decision absent a manifest abuse of that discretion. *Grossi Consulting, LLC v. Sterling Currency Group, LLC*,

290 Ga. 386, 388 (1) (722 SE2d 44) (2012) (citations omitted). See OCGA § 9-5-8 ("The granting and continuing of injunctions shall always rest in the sound discretion of the judge, according to the circumstances of each case."). In determining whether to issue an interlocutory injunction, a trial court should consider four factors:

> (1) [whether] there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) [whether] the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) [whether] there is a substantial likelihood that the moving party will prevail on the merits of [its] claims at trial; and (4) and [whether] granting the interlocutory injunction will not disserve the public interest.

*Grossi Consulting*, 290 Ga. at 388 (1) (citation omitted). "[T]he four factor test for issuing an interlocutory injunction is a balancing test and . . . it is not incumbent upon the movant to prove each factor." *City of Waycross v. Pierce County Bd. of Commrs.*, 300 Ga. 109, 112 (1) (793 SE2d 389) (2016). "All that is material on appeal is that there is evidence which supports the trial court's finding. . . . Where the evidence is conflicting, it can not be said that the court abused its discretion in either granting or denying the injunction." *Bailey v. Buck*, 266 Ga. 405, 406 (1) (467 SE2d 554) (1996) (citation and punctuation omitted).

(a) *Whether there is a substantial threat that Anabaptist and Unity will suffer*

13

*irreparable injury if the injunction is not granted.*

Aliera argues that the trial court erred by finding a risk of irreparable harm, given its finding that Aliera is permitted to solicit people who had been members of Unity to join Trinity. We disagree.

First, we reject Aliera's premise that the trial court's conclusion that Aliera could fairly compete with Anabaptist and Unity conflicts with her conclusion that Aliera likely had misappropriated plan assets by attempting to convert Unity plans to Trinity plans in the November 15, 2018, notification. Aliera characterizes the notification as a solicitation, permissible under the trial court's ruling allowing fair competition. We observe that Aliera sent the notification while Anabaptist lacked Unity members' contact information because Aliera had not provided it and, as the trial court observed, while this litigation was pending. The trial court's findings of fact, which are supported by the evidence, support its conclusion: Aliera used Unity's membership list to notify Unity members that nothing in their plans had changed, except the name of the health care sharing ministry — when in truth Aliera was misappropriating Unity plan assets by unilaterally moving the Unity members to Trinity. There is no conflict between this conclusion and the trial court's ruling that Aliera may *fairly* compete with Unity.

14

The trial court found that Anabaptist and Unity demonstrated a substantial threat of irreparable injury. It found that Aliera planned to transfer all Unity members to Trinity, and that the loss of customers amounted to irreparable injury. , It also found that Aliera's failure to provide Anabaptist and Unity with information about the Unity plan assets and its failure to return control of the plan assets threatened Anabaptist's and Unity's status as 501 (c) (3) organizations, which is integral to their status as Affordable Care Act-approved health care sharing ministries and their ability to operate as health care sharing ministries under numerous state laws. The court observed that once lost, an Affordable Care Act exemption cannot be recovered because the Affordable Care Act requires continuous operation from December 1999. 26 USC § 5000A (d) (2) (B) (ii) (IV). Finally, the court found that Aliera's conduct harmed Anabaptist's and Unity's goodwill by conveying the impression to Unity's members that Unity was somehow unable to maintain its plans. Given that some evidence supports the trial court's findings, we hold that the trial court did not manifestly abuse her discretion in ruling that there is a substantial threat that Anabaptist and Unity would suffer irreparable injury if the injunction were not granted. *Jansen-Nichols v. Colonial Pipeline Co.*, 295 Ga. 786, 788 (764 SE2d 361) (2014) (affirming trial court's ruling on injunction because some evidence, although

15

disputed, supported trial court's conclusions).

Aliera argues that Anabaptist's offer to settle the case for a certain sum (evidence that Aliera argues the trial court erroneously excluded) proves that Anabaptist and Unity had an adequate remedy at law, so an injunction could not be entered. See OCGA § 9-5-1. But "[i]t is important to note it is not enough that there is a remedy at law. It must be plain and adequate, or, in other words, as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity." *Owens v. Ink Wizard Tattoos*, 272 Ga. 728, 729 (533 SE2d 722) (2000) (citation and punctuation omitted). Pretermitting whether or not the trial court erred in excluding evidence of the offer to settle, the fact that a possible monetary settlement was considered does not constitute plain evidence that monetary damages are an adequate remedy, particularly as the trial court found that Aliera's conduct threatened Unity's status as a health care sharing ministry. See *Savannah Cemetery Group v. DePue-Wilbert Vault Co.*, 307 Ga. App. 206, 214-215 (5) (704 SE2d 858) (2010) (permanent injunction). Additionally, "[i]f [Unity's] assets were dissipated because no [injunction was granted], any remedy at law would be meaningless." *D.C. Micro Dev. v. Lange*, 259 Ga. App. 611, 614 (3) (578 SE2d 251) (2003).

(b) *Whether the threatened injury to Anabaptist and Unity outweighs the*

16

*threatened harm that the injunction may do to Aliera.*

As for the second factor, the trial court found that the threatened irreparable harm to Anabaptist and Unity outweighed any harm to Aliera. The court found that any harm to Aliera was largely self-inflicted. The court found that if Aliera had returned the Unity plans to Unity, it would not have had to incur costs associated with maintaining those plans after the contract was terminated; and that if Aliera had not attempted to transition the Unity plan members to the Trinity plan, then it would not have incurred the costs of having to stop the transition. Finally, the court observed that the injunction did not prevent Aliera from selling its own products and marketing and selling Trinity health care sharing ministry plans. Given that some evidence supports the trial court's findings, we hold that the trial court did not manifestly abuse her discretion in ruling that the threatened injury to Anabaptist and Unity outweighs the threatened harm that the injunction may do to Aliera. *Jansen-Nichols*, 295 Ga. at 788.

(c) *Whether there is a substantial likelihood that Anabaptist and Unity will prevail on the merits of their claims at trial.*

As for the third factor, the trial court concluded that Anabaptist and Unity were substantially likely to succeed on their declaratory judgment, breach of contract, and

breach of fiduciary duty claims. We agree with the trial court about the claims for declaratory judgment and breach of contract. About the claim for breach of fiduciary duty, we are in doubt; but as this is a balancing test, do not need to decide.

The trial court so concluded on the basis of her findings: Anabaptist and Unity held all rights to the Unity plans under the terms of the parties' agreement. Aliera serviced the plans solely as a third-party administrator under the parties' agreement. By virtue of its role, Aliera held substantial control over the Unity assets. And Aliera took steps to misappropriate those assets by unilaterally attempting to transition Unity plans to Trinity.

The court observed that her interpretation of the agreement — that the Unity plans belong to Anabaptist and Unity — is consistent with statutes that require health care sharing ministries to be nonprofit organizations, see 26 USC § 5000A (d) (2) (B) (ii) (I); OCGA § 33-1-20, since Aliera is a for-profit company. She also observed that her interpretation is consistent with the fact that under the agreement, Anabaptist granted Aliera a license to market and sell the Unity plans, which demonstrates that Anabaptist owned the Unity plans.

(i) *Declaratory judgment claim.*

Aliera does not argue that the trial court erred by finding that Anabaptist and

18

Unity are likely to succeed on the merits of their claim for a declaratory judgment.

(ii) *Breach of contract claim.*

Aliera argues that the trial court erred in finding that Anabaptist and Unity were likely to succeed on the merits of their breach of contract claim because only Anabaptist (not Unity) has rights under the agreement; and Anabaptist's rights are limited to rights to the roster of members of the Anabaptist health care sharing ministry, not rights to Unity plan assets, including the roster of members who joined Unity. The trial court's interpretation of the contract as described above is plausible and "the record does not demand a finding that [Anabaptist and Unity] are unlikely to succeed on the merits [of the breach of contract claim]." *City of Waycross*, 300 Ga. at 113 (1) (given that interpretation of contract was plausible, record did not demand a finding that movants were unlikely to succeed on the merits).

Aliera also argues that the trial court's interpretation of the contract violates federal antitrust laws in that it allocates customers among horizontal competitors (competitors at the same level of the market structure. See *Yeager's Fuel v. Pennsylvania Power & Light Co.*, 953 FSupp 617, 654 (ED Pa. 1997)). The trial court rejected this argument on the ground that Anabaptist's and Unity's construction of the contract does not allocate customers between horizontal competitors, because Aliera

19

and Unity are not horizontal competitors, given that Aliera cannot qualify as a health care sharing ministry and that under a fair reading of the contract, Anabaptist only granted a license to market and sell the plans of its wholly owned subsidiary, Unity. See *Ad-Vantage Telephone Directory Consultants v. GTE Directories Corp.*, 849 F2d 1336, 1346 (II) (11th Cir. 1987) (Applying Florida law, which tracks federal law, to hold that "there can be no antitrust violation without a competitor, and agents do not compete with those whom they represent."). Aliera's antitrust argument does not require reversal of the trial court's order.

(iii) *Breach of fiduciary duty claim*.

Aliera argues that the trial court erred in concluding that Anabaptist and Unity are likely to succeed on the merits of their breach of fiduciary duty claim because it owes Anabaptist and Unity no fiduciary duty. It relies on language in the contract disclaiming a confidential relationship and establishing an independent contractor relationship. (We observe that this language did not prevent Aliera from asserting breach of fiduciary duty claims against Anabaptist and Unity in its own complaint.)

Georgia law does not offer definitive guidance as to the merits of that argument. There is authority from the United States District Court for the Northern District of Georgia that supports it. *Monopoly Hotel Group, LLC v. Hyatt Hotels*

20

*Corp.*, Case No. 1:12-CV-1250-AT, 2016 WL 9735798, at *26 (ND Ga. Aug. 16, 2016), affd., 694 Fed. Appx. 752 (11th Cir. 2017), and cases cited therein ("Georgia courts have held that fiduciary duty claims fail where the parties' relationship stems from a contractual agreement and the contract expressly provides that it does not give rise to a confidential, fiduciary, or agency relationship between the parties."). But another district court reached a different conclusion. *Lenexa Hotel, LP v. Holiday Hospitality Franchising*, Case No. 15-9196-KHV, 2017 WL 2264358, at *9 (D. Kan. May 24, 2017), and cases cited therein ("Defendant cites Georgia cases which have declined to recognize fiduciary duties in cases where a contract explicitly states that it does not create such a duty. Those cases involve additional facts, however, which demonstrate that the parties were acting to further independent business objectives.").

We need not decide whether Anabaptist and Unity are likely to succeed on the merits of the breach of fiduciary duty claim because of the disclaimer in the contract. This is so because "it is not incumbent upon the movant to prove each [of the four] factor[s]" relevant to determining the appropriateness of an injunction. *City of Waycross*, 300 Ga. at 112 (1). So any failure to prove that Anabaptist and Unity are likely to succeed on one of its three claims does not mean that the trial court manifestly abused her discretion in granting an injunction.

21

(d) *Whether granting the interlocutory injunction will not disserve the public interest*.

As for the fourth factor, the trial court found that an interlocutory injunction is in the members' interest, and thus the public interest. See *City of Waycross*, 300 Ga. at 113 (1) (evidence supported trial court's determination that "public interest, i.e., the public as a whole" would not be disserved by the grant of interlocutory injunction requiring city to continue to provide water and sewer services). Aliera has not shown that the trial court abused her discretion in so finding.

For these reasons, we conclude that the trial court did not abuse her "considerable discretion," *Jansen-Nichols*, 295 Ga. at 788, in granting the motion for an interlocutory injunction.

4. *The appointment of a receiver*.

Aliera argues that the trial court erred by appointing a receiver. We disagree.

"When any fund or property is in litigation and the rights of either or both parties cannot otherwise be fully protected . . . a receiver of the same may be appointed by the judge of the superior court having jurisdiction thereof." OCGA § 9-8-1. Further, "[e]quity may appoint a receiver to take possession of and hold, subject to the direction of the court, any assets charged with the payment of debts where there

22

is manifest danger of loss, destruction, or material injury to those interested." OCGA § 9-8-3."The grant or refusal of a receivership is a matter addressed to the sound legal discretion of the trial court, the exercise of which will not be interfered with on appeal unless such discretion be manifestly abused." *Treu v. Humanism Investment,* 284 Ga. 657, 659 (670 SE2d 409) (2008) (citation and punctuation omitted).

The trial court appointed a receiver to oversee the Unity plans and the Unity plan assets, specifically, the member funds that are properly allocated to the Unity component of member plans, to ensure that the members' claims are paid. The court found that the appointment of a receiver was particularly appropriate in this case because of Aliera's failure to account for Unity funds when Anabaptist demanded such an accounting.

Aliera argues that the trial court abused her discretion because this is merely a contract dispute that does not justify the appointment of a receiver, absent a finding that Aliera is wasting Unity funds or that Aliera may become insolvent. But the court heard evidence that Aliera was misapplying Unity funds by failing to properly segregate them from Aliera's own funds. And those funds were used to pay members' claims. The trial court did not abuse her discretion by appointing a receiver without finding that Aliera was wasting Unity funds or could become insolvent. See *Fulp v.*

*Holt*, 284 Ga. 751, 753-754 (670 SE2d 785) (2008) (appointment of receiver was not an abuse of discretion when partners had agreed to an equal division of income and expenses, and defendant had previously misappropriated funds from partnership).

Finally, Aliera argues that the appointment of a receiver violates a limitation-of-liability clause in the parties' agreement. Limitation-of-liability clauses may not relieve a party from "liability for acts of gross negligence or wilful or wanton conduct." *Holmes v. Clear Channel Outdoor*, 284 Ga. App. 474, 477 (2) (644 SE2d 311) (2007). Anabaptist and Unity have alleged such acts against Aliera. Consequently, the trial court did not manifestly abuse her discretion in appointing a receiver simply because the contract contained a limitation-of-liability clause.

*Judgment affirmed. Doyle, P. J., and Markle, J., concur.*